IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BEATRIZ VELASQUEZ, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CASE NO. 4:12CV66 |
| | § | |
| | § | |
| MICHAEL ANTHONY GREEN, | § | |
| | § | |
| Respondent. | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES
<u>MAGISTRATE JUDGE</u>**

On February 8, 2012, Petitioner Beatriz Velasquez filed this action seeking the return of her daughter, a minor ("JCVG"), to Canada. On March 22, 2012, JCVG's father, Michael Anthony Green, Respondent herein, filed his answer to the petition. On March 26, 2012, the Court issued its order setting a show cause hearing on Petitioner's Petition for Return of Child to Petitioner and for Immediate Issuance of Show Cause Order to Respondent for April 12, 2012. *See* Dkt. 10. The hearing was continued twice by agreement of the parties, and ultimately proceeded on June 6, 2012. *See* Dkts. 12-15. Petitioner then submitted post-hearing briefing on June 19, 2012. Respondent did not file a response. Therefore, the matter is now ripe for determination.

**BACKGROUND**

JCVG was born in Canada on March 1, 2000. Petitioner and Respondent were never married, and there is currently no formal custody agreement in place. Petitioner alleges that from her birth until late 2010, JCVG resided with her mother in Canada, with her father, Respondent,

1

visiting her occasionally. In late 2010, with the apparent consent of her mother, JCVG traveled from Canada to Texas to visit her father for the holidays. According to Petitioner, the understanding between the parties was that JCVG would return to Canada at the start of 2011. Respondent claims that the parties never agreed to a temporary stay in Texas but that rather the plan was for JCVG to come to live with him indefinitely. In any event, JCVG has remained in Texas since late 2010 and not returned to Canada. Several months after JCVG came to Texas, Respondent commenced custody proceedings in Texas state court, seeking custody of his child.

## STANDARD

Petitioner has brought this action for the return of JCVG under the provisions set forth in the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "CONVENTION") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq*. In a case falling under the Hague Convention, a petitioner must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e). In making a showing of wrongful removal or retention here, Petitioner must prove that (1) JCVG was a "habitual resident" of Canada at the time of removal or retention; (2) the removal or retention was in breach of Petitioner's custody rights under the law of Canada; and (3) Petitioner had been exercising those rights at the time of removal or retention. *Edoho v. Edoho*, 2010 WL 3257480, 4 (S.D. Tex. 2010); *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp.2d 828, 841 (S.D. Tex. 2006).[1]

---

[1] The Court notes that the cited cases pertain to wrongful removal rather than wrongful retention. Nonetheless, Petitioner has argued an essentially identical analysis for wrongful retention and the Court agrees such applies.

Even if the Court finds that JCVG was wrongfully retained, however, she will not be ordered returned if one of many exceptions is established. The burden shifts to Respondent to establish by a preponderance of the evidence one of the following exceptions: (1) that the proceeding was commenced more than one year after retention of the child and the child has become "well-settled" in her new environment; (2) that Petitioner was not actually exercising the custody rights at the time of retention or consented to or subsequently acquiesced to the retention; or (3) that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of her views. CONVENTION, arts. 12 & 13; 42 U.S.C. § 11603(e) ("Burdens of Proof"). In addition to these exceptions, Respondent can avoid JCVG's return by showing the following exceptions by clear and convincing evidence: (1) that there is a grave risk that her return would expose her to physical or psychological harm or otherwise place her in an intolerable situation, or (2) that her return would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms. CONVENTION, arts. 13(b) & 20; 42 U.S.C. § 11603 (e). "Courts should narrowly interpret a defense and allow it to prevent the child's return only in meritorious cases when the person opposing return has met the burden of proof." *Van Driessche*, 466 F. Supp.2d at 846.

### EVIDENCE PRESENTED

At the hearing held on June 6, 2012, the Court heard testimony from Petitioner, Respondent, Judith Lopez, Pauline Green, and JCVG.[2] Petitioner also submitted documentary evidence

---

[2] By agreement of the parties, the Court questioned JCVG in the courtroom outside the presence of her parents or any witnesses. Counsel for both sides were present but were not permitted to question the witness. JCVG was not present for any other court proceedings and

including, JCVG's Canadian birth certificate, JCVG's Canadian social security and insurance cards, JCVG's Canadian medical and school records, a Tenancy Agreement for Petitioner in Canada, and Facebook communications between Petitioner and Respondent and Petitioner and her daughter. Petitioner also introduced a copy of the Denton County Petition for Conservatorship of JCVG filed by Respondent and asked that the Court take judicial notice of a Canadian statute regarding custody. *See* Dkt. 19; Exs. 1-12. A brief summary of each witness's testimony follows.

**Petitioner**

Petitioner testified that she has lived in Canada since 1990 and has been a Canadian citizen since 1995. She currently has a job as a flower designer and is in school for real estate.

According to Petitioner, she and Respondent met in 1998 but never lived together and were never married. Their child, JCVG, was born in March of 2000 in Canada, has a Canadian social security number, and is a Canadian citizen.

Petitioner testified that she regularly took JCVG to the doctor in Canada, that JCVG received all required vaccinations, and that JCVG was enrolled in school in Canada and involved in after school programs there. Petitioner testified that Respondent would see his daughter a few times a month or over a weekend and sometimes take her to his home in Buffalo and then return her to Canada. According to Petitioner, with the exception of an extended visit to Texas in the summer of 2010, those visits were never longer than a weekend.

---

remained outside the courtroom until the matter was concluded.

Petitioner testified that she agreed to allow JCVG to visit her father in Texas for the 2010 winter holiday but expected Respondent to return JCVG to Canada at the end of January 2011.[3] According to Petitioner, it was not until October 2011 — when she was served with court papers from Texas seeking custody of JCVG – that she realized that Respondent planned on keeping JCVG in Texas.

**Lopez**

Judith Lopez, Petitioner's sister, also testified. Lopez first met Respondent in 1998 and knew him to be dating her sister. According to Lopez, Respondent was living in her own place when JCVG was born. Respondent has never lived with Petitioner, and Lopez testified to seeing Respondent only once in a while.

Lopez currently lives in Houston but grew up in Canada with her sister. Lopez testified that she saw JCVG in Texas in 2009. At that time, JCVG told her aunt that she was visiting her dad but eventually went back to Canada. According to Lopez, she received a call from JCVG in September or October 2011 during which JCVG told her that she was in Texas visiting but going back to Canada soon. Lopez testified that although she talked to Petitioner two or three times in 2011, her sister did not tell her that JCVG was in Texas or that she was seeking her return.

---

[3] She subsequently testified that JCVG went to Texas in "December 2009 or 2010 or somewhere around there." Despite Petitioner's confusion, her pleadings in this case (as well as other witnesses' testimony) indicate that the removal/retention at issue involves a winter 2010 trip to Texas.

**Respondent**

Respondent testified that he was present at JCVG's birth and that he would see his daughter almost daily from 2000 until 2003. After that, he would visit her approximately two weekends out of the month. After moving to Texas in 2007, Respondent testified, he would visit JCVG a few times a year and made regular phone calls to her.

Respondent claims that Petitioner surrendered custody to him in Buffalo in November 2010. According to Respondent, due to ongoing health and legal issues with Petitioner and difficulties she was facing with JCVG's behavior, he and Petitioner arranged for JCVG to live with him in Texas in November 2010. Respondent conceded that they never determined how long JCVG would live with him but stated that the intention of the trip was more than just a holiday visit. Respondent testified that he and Petitioner decided that his mother would meet Petitioner and JCVG in Buffalo and then his mother would return with JCVG to Texas on November 22, 2010. According to Respondent, JCVG spent Thanksgiving 2010 with him in McKinney, Texas.

Respondent also testified that he enrolled JCVG in McKinney schools in November 2010. Respondent stated that this was why he had requested her school and shot records from Petitioner. According to Respondent, JCVG started school in Texas on December 8, 2010, has only missed three days of classes since being in Texas schools, receives B+s in her classes, and has participated in sports since moving here.

Respondent testified that Petitioner has only called her daughter 11 times since the move to Texas and he has not changed his phone number since moving here. According to Respondent, JCVG talks to her mom frequently on Facebook and Respondent has never restricted any calls from

Petitioner.

Respondent testified that Petitioner did not ask for him to return JCVG until September 2011.

**Pauline Green**

Respondent's mother testified that she made a trip in November 2010 to Buffalo to pick up JCVG from Petitioner. She returned with JCVG on November 22, 2010 via plane to Dallas and lives in Lewisville, Texas.

**JCVG**

JCVG testified that she currently lives in Lewisville, Texas with her grandmother, father and brother, has many of friends, and plays sports outside at recess. She told the Court that she missed many days of school in Canada but is not absent from school very often in Texas. JCVG testified that, although she sometimes liked living in Canada, she is happy in Texas and would rather stay here.

ANALYSIS

*Wrongful Retention*

The Court first addresses whether Petitioner satisfied her burden in showing JCVG was wrongfully retained. To sustain her burden in these proceedings, Petitioner was required to show that: (1) JCVG was a habitual resident Canada at the time of retention; (2) the retention was in breach of her custody rights under the law of Canada; and (3) she had been exercising those rights at the time of retention. *Edoho*, 2010 WL 3257480 at 4; *Van Driessche*, 466 F. Supp.2d at 841.

First, the Court looks at whether JCVG was a "habitual resident" of Canada at the time of retention. As one court has explained:

> A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has 'a degree of settled purpose' from the child's perspective. However, when a child is too young to have an intent regarding habitual residence, the inquiry becomes 'shared parental intent.'

*Van Driessche v. Ohio-Esezeoboh* 466 F. Supp.2d 828, 842 (S.D. Tex. 2006). There is no question here that, prior to November 2010, JCVG was a habitual resident of Canada. As shown by Petitioner – and notably not disputed by Respondent – she was born there, received medical care there, and was schooled there.

Since Petitioner alleges wrongful retention, however, it seems the date the Court must look to is the date she was allegedly *wrongfully retained* in Texas to determine her place of habitual residence. It is clear that "[a] parent cannot create a new habitual residence by wrongfully removing or retaining a child." *Barr v. Barr*, 2011 WL 797664, 2 (S.D. Tex. 2011) (citing *Diorinou v. Mezitis,* 237 F.3d 133 (2nd Cir. 2001); *March v. Levine,* 249 F.3d 462 (6th Cir. 2001). However, as discussed below, there is much dispute about the date the retention may have become wrongful (if at all) and whether Petitioner intended for and consented to JCVG to come to Texas for more than a holiday visit. Thus, this matter remains unsettled.

Next, the Court turns to whether Respondent's retention of JCVG in Texas was in breach of Petitioner's custody rights under the law of Canada. The Hague Convention distinguishes between a right of custody and a right of access. *Van Driessche*, 466 F. Supp.2d at 843. The Hague Convention's provisions on the Civil Aspects of International Child Abduction define "rights of custody" as those rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence. CONVENTION, art. 5. "[R]ights of access," on the other

hand, include the right to take a child for a limited period of time to a place other than the child's habitual residence. *Id.* "[A] parent with a mere right of access does not have a right of custody to invoke the Convention protections that require this Court to return the child." *Van Driessche*, 466 F. Supp.2d at 843.

Further, in *Abbott v. Abbott*, the Supreme Court held that *ne exeat* rights are sufficient to confer rights of custody under the Hague Convention's provisions. *Abbott v. Abbott*, 130 S. Ct. 1983, 176 L. Ed.2d 789, 176 L. Ed.2d 789 (2010). *Ne exeat* rights involve one parent's right to consent before the other parent takes the child to another country. *Id.* at 1987.

Here, it is undisputed that there was no formal custody agreement in place as to JCVG when she left Canada in 2010. When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention. *Sealed v. Sealed,* 394 F.3d 338, 343 (5th Cir. 2004). Petitioner has cited to Ontario law, R.S.O. 1990, Chapter C.12(20)(4), which provides "[w]here the parents of a child live separate and apart and the child lives with one of them with the consent, implied consent or acquiescence of the other of them, the right of the other to exercise the entitlement of custody…is suspended until a separation agreement or order otherwise provides."

The Court finds that Petitioner here has established that she had *ne exeat* rights as to JCVG when she left for Texas in November 2010. What is unclear to the Court is how Petitioner's alleged consent to a move to Texas would affect such rights under Canadian law. Although the Canadian statute clearly establishes that Petitioner had certain custody rights up until November 2010 –

because up until that time JCVG had lived with her with Respondent's apparent consent – how those custody rights may have been affected by (as Respondent alleges) Petitioner's consent that JCVG move to Texas to live with Respondent is less clear. Thus, the second prong of the wrongful retention analysis remains unsettled.

Finally, the Court turns to whether Petitioner was exercising her purported custody rights at the time of retention. As set forth above, all of the prongs of the wrongful retention analysis hinge on the parties' intent in having JCVG come to Texas. If it was — as Petitioner alleges in her pleadings — merely a holiday visit, expected to last from November or December 2010 to sometime in January 2011, then it would seem to the Court that Canada would have remained JCVG's country of habitual residence, where Petitioner had custody rights under Canadian law, which she was exercising up until the point of wrongful retention. If, however, it was — as Respondent has alleged — a decision between parents that JCVG come to live with Respondent indefinitely then Petitioner's purported consent (whether it be express or implied) defeats a finding of wrongful retention.

Of particular concern to the Court here are the Facebook communications introduced into evidence by Petitioner. Contrary to her position in this case, the Court finds that they support Respondent's claim that – at the time JCVG left Canada – the plan was for her to remain in Texas indefinitely.

On November 17, 2010, shortly before JCVG came to Texas, Respondent reminded Petitioner that he would need JCVG's "papers for school also." Ex. 10 at 3. Although Petitioner claims that Respondent wanted the school papers so that he could claim JCVG as a dependent on

10

his taxes, the Court finds that the statement supports Respondent's claims that he needed JCVG's Canadian school records in order to enrol her in school in Texas.  There is no evidence – other than Petitioner's testimony – that Respondent used the school records for tax reporting purposes and the Court does not find Petitioner credible on this issue.

More importantly, communications after JCVG came to Texas fail to indicate any surprise or urgency on Petitioner's behalf as to JCVG's continued presence there. On January 23, 2011 – around the time Petitioner originally claimed she expected JCVG to be returning to Canada – she asks how her daughter is doing.  The next communication – more than a month later – asks Respondent to wish JCVG a happy birthday.  A month after that in April 2011 – after Respondent failed to respond to the Facebook messages – Petitioner says she needs to know if her daughter is ok.  Ex. 10 at 3-4.  At no time in the Facebook messages from January through April 2011 does Petitioner address in any way the return of her daughter to Canada.  Indeed, after she asks for (and receives) a loan from Respondent and Respondent informs her that JCVG says hello to her, Petitioner responds "ok said [sic] hi to her tell I miss her so much and love thank u so much for the money." Ex. 10 at 6.  The Court finds that this statement does not support a finding of wrongful removal as claimed by Petitioner.   In fact, it is not until July 27, 2011 that Petitioner first raises the matter of JCVG's return with Respondent in the Facebook messages.

It does appear from Petitioner's communications with her daughter that she asked her when she was coming to Canada as early as June 2011. Ex. 11 at 1.  Not only is this inquiry more than six months after JCVG's travel to Texas for a purported holiday trip, the Court cannot decipher whether it refers to a trip to Canada for a visit or an actual permanent return to the country.  Indeed, in

September 2011, Petitioner's communications with her daughter ask her how she has been and what she has been up to, in addition to asking again when she is "coming home." The tone and nature of the Facebook messages simply do not establish – by a preponderance of the evidence – that JCVG was wrongfully retained away from her mother.

The Court notes that one of the exceptions to a wrongful removal or retention finding is, proof (by Respondent) that Petitioner was not actually exercising her custody rights at the time of removal or retention or consented to or subsequently acquiesced to the removal or retention. CONVENTION, art. 13(a). "Acquiescence under the Convention requires either an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *In re A.V.P.G.,* 251 S.W.3d at 126. A respondent must show this exception by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e).

In this case, the Court is neither convinced that Petitioner has shown by a preponderance of the evidence that JCVG was wrongfully retained in Texas, nor is the Court convinced that Respondent has shown by of preponderance of the evidence Petitioner's consistent attitude of acquiescence over a significant period of time.

Because there is significant dispute as to whether Petitioner consented to have JCVG live in Texas and because some of Petitioner's testimony lacked credibility and was inconsistent with both her pleadings and the testimony of other witnesses, the Court is hesitant to find that Petitioner has sustained her burden in showing wrongful retention. Nonetheless, the Court need not make a determination as to wrongful retention to find that JCVG need not be returned to Canada until a

further custody order is issued as the Court finds several exceptions to return apply here.

*Well-Settled*

Even if a child is determined to have been wrongfully removed or retained, when an action for return of a child is commenced more than one year after the removal or retention of the child and the child has become "well-settled" in her new environment, the Court is not required to order the return of the child. *See* CONVENTION, art. 12. The well-settled exception must be proven by Respondent by a preponderance of the evidence. 42 U.S.C. § 11603(e).

Article 12 of the Convention is very clear that the Court looks to the date on which *these* proceedings were commenced in applying the one-year limitations period. CONVENTION, art. 12; *see, e.g., Muhlenkamp v. Blizzard*, 521 F. Supp.2d 1140, 1152 (E.D. Wash. 2007) ("The petition must be filed with the court of record, not the Central Authority, to file within the one-year limitation.").

This case was filed on February 8, 2012. JCVG was removed from Canada in November 2010. Petitioner asks the Court to look to the filing of the Denton County petition for conservatorship to determine when JCVG was wrongfully retained. Petitioner testified that she was served with the state court action in October 2011 and claims that it was not until this date — almost a year after JCVG went to Texas for the holidays — that she realized that Respondent would not be returning her daughter to Canada. Thus, Petitioner argues, this is the date that triggers the running of the one-year limitations proceedings. The Court disagrees.

Both Petitioner's Petition for Return of Child and Pre-Hearing Brief indicate that JCVG was to be returned to Canada before school started after the holidays in January 2011. Petitioner's

pleadings contain the following allegations:

- "In December 2010, Ms. Velasquez allowed [JCVG] to visit Respondent for the holidays with the understanding that [JCVG] would return in January before school began." Dkt. 1 at ¶9.

- "After the Christmas holidays, instead of returning [JCVG] to her home in Canada so she could continue with school, Respondent unilaterally decided to retain [JCVG] in Texas. Respondent repeatedly made excuses as to why he was unable to return [JCVG] to Canada. But Respondent stopped offering excuses and cut off Ms. Velasquez from any communication with her daughter." Dkt. 16 at 1.

- "Respondent had never supported [JCVG] financially until he wrongfully retained her in 2010." Dkt. 16 at 3.

- "[JCVG] was retained in January 2011 when she was supposed to be returned to Canada." Dkt. 16 at 6.

More importantly, according to Petitioner's **sworn** declaration, attached to her Pre-Hearing Brief: "In December 2010, I allowed [JCVG] to travel to Texas to visit Michael for the holidays with the understanding and agreement that she would be returned right after, in January, as the school period in Niagara Falls, Ontario, Canada, started on January 10, 2011." Dkt. 16-1 at ¶4. Petitioner signed the declaration before a notary claiming to "declare under penalty of perjury that the foregoing is true and correct." Dkt. 16-1 at 3. Such statements are judicial admissions by Petitioner, and any inconsistencies regarding the date of wrongful retention shall not be attributed to an error by counsel.

Petitioner's attempt to correct the inconsistencies between Petitioner's pre-hearing pleadings and arguments during the hearing does not save her claims from the one-year statute of limitations. In claiming that the one-year statute of limitations did not begin to run until Petitioner became aware of Respondent's "true intention" not to return JCVG to Canada, Petitioner's Supplemental Brief

claims that "Mr. Green admitted that he did not form the intention not to return Jocelyn until September or October of **2010**." Dkt. 20 at 3 (emphasis added). Such a date is not consistent with anything presented during the hearing. Petitioner is bound not only by her pre-hearing pleadings but by her sworn declaration and her testimony in Court. The Court finds that these proceedings were not commenced within a year of any wrongful retention, which occurred, if at all, sometime in January 2011, based on Petitioner's position at the time suit was filed.[4]

Because more than a year has elapsed, the Court then looks to whether JCVG is well-settled. Courts determining whether a child is well-settled can look to the following factors: (1) the age of the child; (2) the stability and duration of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; (6) whether the child attends church regularly; and (7) the father's employment and financial stability. *Edoho v. Edoho*, 2010 WL 3257480, 6 (S.D. Tex. 2010); *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp.2d 828, 847 (S.D. Tex. 2006); *In re A.V.P.G.,* 251 S.W.3d 117, 125 (Tex. App. – Corpus Christi 2008, no pet.). "[F]or the child to be well-settled, the court should consider more than whether he or she has a comfortable material existence, taking into consideration the child's living environment and any active measures taken to conceal a child." *Van*

---

[4] Further, because there was no evidence presented suggesting that any efforts were made to conceal JCVG's whereabouts in Texas from Petitioner (indeed, the evidence indicated that JCVG freely communicated with her mother on Facebook), equitable tolling is not available here. *Van Driessche*, 466 F. Supp.2d at 848 ("The purpose of equitable tolling is to ensure that a parent who takes intentional and significant steps to conceal his or her children for more than one year will not be rewarded for that misconduct by creating eligibility for an affirmative defense not otherwise applicable").

*Driessche*, 466 F. Supp.2d at 848.

Having considered the testimony presented, the Court finds that JCVG is well-settled in the United States. *Van Driessche*, 466 F. Supp.2d at 847-48 (finding the well-settled exception applied where six year-old child had been continually residing in Houston for two-thirds of her life); *Edoho*, 2010 WL 3257480 at 6 (applying well-settled exception where children had lived in Houston for almost two years, lived close to extended family, participated in activities and church, and attended school). Since coming to Texas, she has been enrolled in — and regularly attended[5] — school. She testified to having friends and appears to be a well-adjusted pre-teen girl. She lives her father, her brother, and her paternal grandmother. She testified that she has a close relationship with her grandmother (an individual who appears to be active in JCVG's daily life) and has a good relationship with her father. Moreover, her father is employed and appears financially stable. More than one year has elapsed since JCVG came to – and remained in – Texas, and she is well-settled here. Thus, the exception set forth in Article 12 of the Hague Convention applies and return is not appropriate.

*Age and Maturity*

The Court also finds that JCVG's desire to remain in Texas should be taken into account. The Hague Convention permits the Court to refuse to return a child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of her views. CONVENTION, art. 13. It is not enough that the child has maintained

---

[5]According to the Canadian school records presented, JCVG was absent a significant number of days from school while in Canada.

friendships, prefers her new residence over the country of removal, or enjoys a more stabilized situation to support a finding that the child is mature enough for the Court to take into account her views. *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000) (finding 13 year-old had not attained sufficient maturity). No age is too young or old enough as a matter of law for the exception to apply, but must be determined on a case-by-case basis. *See id.*

When questioning JCVG, it was clear to the Court that she is sufficiently mature such that her wishes should be taken into account. She – unlike many seasoned counsel and adults who appear before the Court – listened to directions, heeded the Court's warnings regarding proper court conduct, and was a polite in her testimony. She behaved appropriately, was well-spoken, and even knew the precise name of her father's employer. She also testified that she preferred to remain in Texas in part because she is receiving a better education here. The Court finds this statement exemplifies her level of maturity and that her wishes are another basis to deny the request that she be returned to Canada. *Compare England*, 234 F.3d at 272-73 (finding that district court erred in applying maturity exception to 13 year-old who had been diagnosed with Attention Deficit Disorder, had learning disabilities, took Ritalin regularly, and was scared and confused by the circumstances producing the litigation).

*Grave Risk & Fundamental Fairness*

At the hearing, Respondent's counsel also claimed that there is a grave risk that the return of JCVG to Canada would expose her to physical or psychological harm or otherwise place her in an intolerable situation, another exception preventing removal under Article 13(b) of the Hague Convention on the Civil Aspects of International Child Abduction. CONVENTION, art. 13(b).

17

Respondent was required to show this exception through clear and convincing evidence, a higher standard than that which applies to the above-discussed exceptions. "In order to invoke this exception, the Respondent must show by clear and convincing evidence that returning the child would place the child in an intolerable situation." *Van Driessche*, 466 F. Supp.2d at 847; *see also* 42 U.S.C. § 11603 (e) (setting forth clear and convincing burden of proof). "The harm must be greater than normally to be expected when taking a child away from one parent and passing the child to another parent." *In re A.V.P.G.,* 251 S.W.3d at 127.

In this case, there is no evidence before the Court that would show that JCVG would face grave harm if she returned to Canada. *England*, 234 F.3d at 272 (finding district court erred in applying grave risk exception where no evidence in the record of potential psychological harm). Although her grades and school attendance have improved since coming to Texas and although some of Petitioner's Facebook conversations with her daughter seem less than appropriate for parent-child communications, such is not enough to convince the Court that she faces a risk of grave harm if she were to return living with her mother. *In re A.V.P.G.,* 251 S.W.3d at 127 ("The focus is on the children....It does not matter if Guajardo is the better parent in the long run, had good reason to leave her home in Belgium and terminate her marriage, or whether she will suffer if the children are returned to Belgium.").[6]

---

[6]For the same reasons, the Court declines to find that fundamental principles of human rights and fundamental freedoms would not permit JCVG's return. CONVENTION, art. 20; 42 U.S.C. § 11603(e). Such exceptions simply have not been shown in this case.

## CONCLUSION

The Court's role in determining Petitioner's Petition for Return of Child is very limited. *See Castro v. Martinez*, 2012 WL 359901, 4 (W.D. Tex. 2012) ("The Convention is not concerned with establishing the person to whom custody of the child will belong at some point in the future; it seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about by the unilateral action by one of the parties."). The Court is not tasked with determining the parties' custody rights as to JCVG, only whether she has been wrongfully retained in Texas. *See* 42 U.S.C. § 11601; *In re A.V.P.G.,* 251 S.W.3d at 122.

Because the Court finds that, even if there were wrongful retention here, Respondent has satisfied the well-settled and age and maturity exceptions outlined in the Hague Convention, the Petition for Return of Child should be DENIED and this matter should be closed on the Court's docket.

Petitioner and Respondent shall each bear their own legal fees, costs, and travel expenses.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual

findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 13th day of July, 2012.**

                                                                                                      _____
                                                                                                      DON D. BUSH
                                                                                                      UNITED STATES MAGISTRATE JUDGE